John Lewis, I have the pleasure and privilege of representing Bill Schwyhart and Carolyn Schwyhart in this appeal from a final judgment by the United States Bankruptcy Court for the Northern District of Texas, Judge Harlan D. Hale presiding, as well as an appeal from an order of Judge Hale denying Mr. and Mrs. Schwyhart's request for the issuance of an appeal. This is a unique procedural posture in the sense that Mr. and Mrs. Schwyhart actually won the trial and they are the appellees in the direct appeal for the objection to discharge, yet they are the appellants with respect to the denial of the written order pending the disposition of this appeal. So we get to go first on that point and we're going to have to address the other issues as the appellees. I have a question about the district court denied the discharge order saying, well, a notice of appeal had been filed, so I'm divested of jurisdiction. Does everyone agree the Bankruptcy Court could have issued that discharge order before the notice of appeal was filed? Yes. Is this just a timing issue? Normally would a Bankruptcy Court issue the big opinion it issued and then if this very same day it's said, and I'm issuing this order of discharge, is that the normal course? That is the normal course and actually how it works, Judge Costa, is the issuance of this order is a forum order that the clerks issue and it's actually when you file a bankruptcy case that the clerk's office sets it on a schedule and if none of these objections are filed, it will issue automatically actually without any court involvement. Once an objection is filed, like CHP did in this case, it gets put on hold, you have to make the request. Unfortunately, we did not ask the court to issue the discharge until after the appeal had been filed 14 days later. Had I done it earlier and could have gotten a hearing or Judge Hale would have considered it, he would have been able, I believe, to issue it at that time because the rule clearly says you forthwith issue the discharge, it's Rule 4004C of the Federal Rules of Bankruptcy Procedure, you forthwith issue it unless, there's a list of exceptions, one of those exceptions is there has been a complaint objecting the discharge that has not been decided in the debtor's favor. And in this instance, there was a complaint filed but it was decided in the debtor's favor with a final judgment, the judgment that opposing counsel and my opponent has appealed. Your Honor, we believe that the judgment in this case is no different than any other federal court final judgment. On appeal, if you wish to stay the effect of that judgment, then you should ask for a stay and to the extent necessary, post a action to protect the interests of the winning or the prevailing party. In this instance, Mr. and Mrs. Schweighart have been waiting now almost two years for this little piece of paper that says you got a discharge. So if this is no different than any other type of case, why doesn't Griggs apply? Excuse me, Your Honor? I think you said this is no different than any other type of judgment? Yes, Your Honor. So Griggs applies? Yes. The to stay the effect of the final judgment, there should be a request for a stay, let the trial court, in this case the bankruptcy court, decide the various standards for issuing a stay and if necessary, protect Mr. and Mrs. Schweighart. Because as I explained... You said for two years you haven't had this discharge order you wanted, but now we're here at the appeal and we're going to decide whether the bankruptcy court was correct to deny the other party's objection. So I mean, why isn't it we're going to rule one way or another on that and then either you'll get your discharge order or if we reverse, you're not entitled to it. I mean, why isn't it moot, in other words? That question, Your Honor, I've been wrestling with all day because I knew one of you were going to ask me that. And I do not have a real clear answer to that because under most circumstances, yes, if you affirm Judge Hale, then he's going to issue that discharge on remand once he gets the mandate. And for all intents and purposes, the direct appeal is probably moot. However, I would ask this court to consider two factors. The first factor is that this is a very important issue that really has no precedent or no decisions out in the body of bankruptcy law. This will be a very important issue. And if you're asking us to reach the issue for the benefit of the bankruptcy bar, but for your clients, it's moot. Correct, Your Honor. I appreciate the idea, but I just want to divide up. I understand. And the second reason, of course, is that had this court not allowed the direct appeal of CHP's appeal for the final judgment, we probably would have been here beforehand. Because the reason this court granted a direct appeal to your court, not going through the district court, was because of this issue. Prior to that, we were proceeding in the district court. In fact, Judge Fish had this case, and we actually briefed it once, the basic one. So I think because of the importance of the issue and the unique procedural posture of this case, we would ask this court to go ahead and address those, provide guidance, and to clear up some issues to prevent this in the future. With that, Your Honor, I'd like to move to the issues brought by or raised by CHP in their appeal. And they raised three issues. The first is whether Mr. and Mrs. Schweihart kept and maintained adequate books and records to enable parties and interests to ascertain their financial condition and their business transactions for a reasonable period of time. The second issue, and that was, that's the issue or the objection under Section 727A3 of the Bankruptcy Code. The second issue I will address is the issue as to whether discharge should have been denied because of any false oaths, errors, or omissions that Mr. and Mrs. Schweihart may have made in their bankruptcy case. And that would be an objection under Section 727A4. Similarly, an objection under Section 727A4 for false oaths on account of any reckless disregard for the truth that CHP maintains that Mr. and Mrs. Schweihart exhibited in the case. I do not intend, unless the court wants me to, to address the other issues raised by CHP, which are evidentiary in nature, whether the court erred in granting or denying part of the motion in limine before trial, allowing Mr. and Mrs. Schweihart's bankruptcy counsel to testify as a witness at trial, and allowing draft schedules to come in as evidence. I don't believe, I believe, one, they've been adequately addressed in our briefs. Two, I don't believe, even if you believe, don't believe that even if this court finds that there was error, that it would be reversible error, I think it would be harmless error, the record is replete with other evidence, specifically the testimony of Mr. and Mrs. Schweihart as to what they did and what they relied upon and who they consulted with respect to filling out their schedules in their Statement of Financial Affairs, and why, if there are mistakes, why those mistakes occurred. I don't believe we have to address the evidentiary parts. So moving on to the 727A3 requirement to keep adequate books and records. I would note that Mr. and Mrs. Schweihart are individual debtors in an individual Chapter 7 case. They were not involved in business at the time of their bankruptcy. Yes, the vast majority of their debts were business debts. These are debts that were incurred back ten years earlier. You'll acknowledge they're unusual for personal debtors. I mean, they're obviously pretty sophisticated when it comes to these transactions. Oh, yes. I'm not stating that Mr. Schweihart was unsophisticated. He was a very sophisticated businessman. His wife, not so much, although she was a bookkeeper. And that was never denied, and that was evidence presented to Judge Hale. And in his opinion, 30 pages, or close to 100 paragraphs of findings and conclusions, he found that they were sophisticated. He found that they had experience. There's no question that someone who incurs $80 million of debt, mainly as guaranteeing real estate type of investments in the 2000s, is relatively sophisticated. That's not the issue, however. The issue is that CHP doesn't complain about records relating to this business transaction, that real estate development, that car dealership, whatever those business entities were. They complain about one particular entity, an entity called HMG, which was indirectly owned and controlled by Mr. and Mrs. Schweihart. And they're complaining that you are showing $490,000 worth of, that you owe them $490,000. They're a creditor in the case. But we don't have a promissory note. We don't have a loan agreement. And when you look, we do have, however, we do have bank account statements. We do have bank records. And you do show money coming in and money going out. And then you have the testimony by Mr. Schweihart explaining why he considered these to be loans, and why he put them on the schedules. But the fact of the matter is, $490,000 loan, $490,000 loan, in a bankruptcy case with $82 million of other creditors, where the HMG creditor does not even file a proof of claim, does not come into the court and say, I want to share in the distributions, if any, and I want to dilute what other creditors receive, is really not material. It's really not a transaction that you need to drill down to that level of detail to ascertain the debtor's financial condition. Throw out $490,000 of loans due to HMG. The debtor is still hopelessly, hopelessly insolvent. You do not need to know that, drill down and get to the level of detail that CHP would argue that we need to have to actually understand the debtor's transactions. Again, most of the, and the testimony is in the record from Mr. Schweihart, that most of the advances in the loans that he considered occurred over a period of 20 years. A lot of it occurred 10 years or more before filing for bankruptcy. Again, it was a transaction and a set of transactions between Mr. Schweihart and one of his entities. On whether the false statements were intentional, the district court relied on its view of the credibility of the witnesses. That's where deference is at its greatest, so that's the good news for you. When I read the thorough order from the bankruptcy court, my concern is it was looking at each misstatement individually. Sure, when you look at one or two or three, you know, mistakes happen. It's not necessarily intentional. When you start to look at over a dozen misstatements, that starts to look pretty suspicious. So where can you show me that the bankruptcy court looked collectively at all the misstatements in deciding whether there was fraudulent intent? Your Honor, what Judge Hale said in his decision, and I'm going to go back to that, is that I'm wanting to say it's like paragraph 95, it could be possibly paragraph 93, or there, it's toward the end and toward the conclusion. What Judge Hale says is that, and I actually think Judge Hale, if he had found 15 or 20 separate, discrete errors or mistakes that were unrelated to each other, it may very well have come out differently. What he says is that all of these mistakes, when you start adding them up, it's not just a numbers game, they all relate to this HMG. And there, he says, everything relates to HMG. Did you list payments to your credit card company? It's an HMG credit card. Did you list the orthodontics for your grandson that was paid with the HMG? Everything relates to that. He says because of that one big mistake, he only, he creates that as one big mistake, because it all emanates from the same source. And then he says, oh, the other, the HMG, they, I mean, they're paying, like you said, orthodontics bills, all these personal expenses out of it. That's hard to reconcile with thinking you didn't own the, own the accounts. I mean, it was paying their personal expenses routinely. That is where the reliance on counsel comes in and why Judge Hale addresses Mr. Moore's involvement. The evidence at trial was that Mr. and Mrs. Schweighart received the bankruptcy schedules and the Statement of Financial Affairs, and they, they wrote in their answers. And the evidence at trial, these draft schedules would show where they would list in their own handwriting, do we need to list HMG with question marks, or should we include this? And it was Mr., and Mr. Moore testified as the attorney on the stand, under oath, that he was the one that gave the counsel, and he was the one that made the decision that the way the questions were asked on those pieces of paper, and the, and the actual facts as he understood them, they did not need to be disclosed. And what's even more important, I think, is that from the, from the very beginning, when you went to the creditor's meeting, when you produced documents later on at the request of the Chapter 7 trustee or the United States trustee, and, and 31 categories of documents were produced, nothing was ever concealed or hidden involving HMG. This was all out there to the extent, if you want to characterize it, it's hiding in plain sight. There was never any effort to obfuscate, to conceal, to mischaracterize HMG as anything but what it was. So, again, the, as, as Judge, as Judge Hale found, these debtors were honest. Thank you, counsel. We can't hear you. So then. It caught me by surprise. Thank you, Judge. Good morning, your honors. May it please the court. I'm Brian Ferguson, and I'm here today representing CHP. I want to spend my time today, similar to Mr. Lewis, addressing three of the four issues that CHP raised in its appeal. I plan to rely on my briefs for the other issues, including their appeal. One very material item that cuts across all three of the issues is the HMG bank account, and for that reason, I provide you with an exhibit which details important information from the HMG account. You can see at the top that there were only two signers on the account. Those were the debtors. There's the part of the record on appeal, just to the right of that, shows you where you can find that, that information. Mrs. Swire testified that the primary account, that this was the primary account she used for paying personal bills, and there's a record that shows you that. You can see, for example, in June of 2015, they spent $40,000 from their account, and the record is to the right. During the month that they filed bankruptcy, which was July 18, they spent over $16,000 from this account. This is an account that was not disclosed. Turning first to the issue of sufficiency of records, the bankruptcy court found that the debtors kept adequate records only based on Mr. Swire's oral representations. Specifically, in paragraph 83 of the findings of fact and conclusions of law, the court held that the records produced coupled with Mr. Swire's explanations are sufficient. That's record on appeal at 178. However, the bankruptcy code does not allow for oral supplementations of the records. The records themselves have to be sufficient, and this court recognized that in International Shoe Company v. Lewin in 1934. Admittedly, that was under the old Bankruptcy Act and not the Bankruptcy Code, but the language in the statute is nearly identical. In the old Act, it said things like books of accounts. The new Act says more modern words like recorded information. Essentially, it's the same. Also, the Seventh Circuit and Jusui Act, which is a more recent case under the Code, reaffirmed this principle, and that's under the current Code. By using the words coupled with, it should be clear to this court that the bankruptcy court relied on Mr. Swire's oral supplementations of the records and forced CHP to rely on Mr. Swire's oral explanations. This is the same Mr. Swire that the court ruled made 15 false statements. Simply put, the bankruptcy court erred in ignoring this court's precedent in International Shoe and holdings in the Seventh Circuit. The bankruptcy court on this would overrule precedent from this court and create a circuit split with the Seventh Circuit under 727A3. Now, I'd like to turn to the falsos, which I know you questioned about the numerosity. Right. I mean, so you heard my questions, and I think there's a lot of suspicion, and I mean, your exhibit backs up what I was saying about how the account was being used for personal said they were, he thought they were honest and just made a mistake that wasn't intentional. How do we, sitting in this courtroom, never having heard from the Swires, say that was clearly erroneous? I'm going to get you there three ways, Your Honor. First way is the bankruptcy court said that their testimony, that they thought the money in the HMG account was not their money. They thought it belonged to HMG, and that their actions, their behavior was consistent with that. I'm going to show you how it's not. Also, Your Honor, the bankruptcy court excused their failure to identify the HMG account based on advice of counsel. I'm going to show you how that's not correct. And also, Your Honor, I'm going to point to precedent from this court about the numerosity, as you pointed out. So, the bankruptcy, in its oral ruling on summary judgment, the bankruptcy court held that there's no genuine issue of material fact that the debtors had an equitable interest in the HMG account and its contents. The court found that the debtors used the account for personal expenses, exercised dominion and control of the funds in the account, and transferred over $16,000 from the account after the petition date. Yeah, but they excused their behavior because they relied on advice of counsel and they Well, in that pattern of behavior, they said they thought the money belonged to HMG as in the fines of fact of paragraph 33. This is clearly erroneous because question 23 in the Statement of Financial Affairs, which the bankruptcy bar always says SOFA, so apologize if I confuse you, but in their SOFA, the question, in question 23, says, Do you hold or control any money that someone else owns? So if they had a true and honest belief that the money in the HMG account belonged to HMG, they would have had to disclose it here in question 23. And the Eighth Circuit BAP had this similar situation in a case I recited, I cited in our brief called Cecil. And there it was very interesting, too, because the woman, just like Ms. Swire, was a bookkeeper, and she had access to a lot of accounts, and some of them were charitable accounts, and she didn't disclose any of them. Now, some of them she had ownership in, and some she didn't, but she had control over them. And she said most of those because she didn't think her creditors could reach them. She didn't think the money in the account was hers. But the court found that that was inconsistent with the way she answered that question in the SOFA that says, Do you hold or control any property of somebody else's? Here, the Swires thought it was important to tell the court that they had a refrigerator and an oven in the apartment that they rented, but didn't think it was important to tell them about the bank account where they spent more than $689,000 in 56 months leading up to the bankruptcy, including $16,000 in the month of their bankruptcy, $16,000 after the petition date. So, to me, I think you can be left with a firm and definite conviction that the Bankruptcy Court erred in excusing the debtor's failure because it's not consistent. Their pattern of behavior is not consistent the way the court found. Another way it's not consistent is also in their SOFA, which is in the record at 2956, there's another question that says, How much did you pay your bankruptcy attorney? And they put in there an amount that's a little over $15,000. And that question in the SOFA also says, And who provided the money? Or, excuse me, Show who provided the money if it was not the debtor. And they left it blank. And the court found that that was another false statement, that failing to identify that HMG provided the money was another false statement. But it's also consistent with their belief that the HMG account was their own money, because they didn't think about, Why should we identify that to the court? How would this have affected your client? Let's say you're right on the underlying failure to disclose and the false statements. Then they don't get a discharge and we're able to continue collections. Does it affect what you're able to recover? I'm the only lawyer I know who tries to collect money judgments for a living, and I think, Yes, it does. We can't collect anything now, but if they're non-dischargeable, Well, let me ask you this. You're not the only creditor, I take it? That's correct, Your Honor. I think we're the only active creditor, I will say that, although I did get a lot of phone calls from other creditors. I guess what I'm curious about is, Why are you the only creditor who's here? Well, Your Honor, most of these were national creditors. There's $80 million of claims. Over $30 million of that was Bank of America. A lot of these are big national creditors, and a lot of times the debt had been sold, or some of these were lenders that went under, and some of these airplane lenders, I think, are not even around anymore. But in this court, in Baboof, the court held that the existence of more than one falsehood, together with the debtor's failure to take advantage of the opportunity to clear up all inconsistencies when he filed his schedules, constituted a reckless indifference to the truth. And the First Circuit has said the same thing in Tully, that failure to amend schedules promptly evidences a reckless indifference to the truth. And here, the debtors never amended. They had the opportunity to. In fact, they did amend Schedule A, B, and C because of an objection to a claim of exemptions, but they never added creditors. They never – The cases to me just say that, sure, those facts could give rise to that conclusion. I don't think there's any dispute that here, the bankruptcy court on this record could have found in your favor. But the question is, did it have to find in your favor? That's an interesting question, Your Honor, because there is an unpublished opinion, Mitchell, from this court, that has created some kind of confusion with the bankruptcy courts, in that at least one court has interpreted that as, we must count, and most of the others have said, well, there's got to be more to it than that. And so maybe this is an opportunity to clear up some of that confusion. It just seems to me intent is always for the fact finder. What's in someone's mind is always going to be a fact issue, right? Because there's usually not – unless someone admits, oh, I was scamming everyone on my bankruptcy schedules, it's going to have to be guessing what was in that person's mind. Take that – but they're relying on the advice of counsel that says you don't need to disclose this, right? That's the way they defeated this – at least they defeated this false statement, not being a false oath, because they said they relied on the advice of counsel. This court has said – and of course, it's true, a debtor may rely on the advice of counsel if it's reasonable and if it's in good faith. But this court has held that a debtor may not rely on the advice of counsel to defeat a false oath claim regarding an omission in a schedule if it is transparently plain that the item should have been scheduled. And this court in Dupree affirmed the lower bankruptcy court, which is from Judge Dodd in the Middle District of Louisiana, that said bankruptcy cases operate in reliance on debtors making full, complete, and honest disclosures in their schedules. This court in Pratt, which is a 2005 case, noted, and I'll quote, few if any assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that creditors can discern not only an overall picture of the debtor's affairs, but also the details of the debtor's finances. So if a bank account is the most material asset to a consumer debtor's bankruptcy, it's got to be transparently plain that it needs to be disclosed. The main account from which they're paying their personal bills must be disclosed. And so if this court holds that the advice of counsel was transparently wrong, that they needed to disclose the primary bank account because it's the most important asset and because bankruptcy cases operate in reliance on full and complete disclosure, then there is a false statement right there because the court said they relied on their advice of counsel in not disclosing that asset. And we can talk about why is it important to disclose the bank account. Here it's interesting. From the bank account that we finally discovered and got the records of, we learned that they received regular income from HMG, which was not reported on their Schedule I, and the Bankruptcy Court ruled that's a false statement. Not reporting that income is a false statement. From the bank account, we learned that they were paying American Express regularly, and we learned from that that Mrs. Swire was an obligor and that they had omitted on the American Express card and they had omitted American Express from their bankruptcy schedules. We learned that they paid American Express $18,777 in the preference period prior to their bankruptcy. We wouldn't have known that had we not had this account. So the court said that the failure to identify that payment to American Express in the preference period was a false statement. The HMG paid the majority of their attorney fees. The court ruled that not disclosing that was a false statement. How did we determine that? Only because we finally got the bank statement that we discovered. It's something that was hidden from us. So a large amount, we discovered that during the preference period, Mrs. Swire wrote a check for more than $15,000 to a trust for which she was the trustee as payback of a loan, and that was during the insider preference period. We discovered that they failed to disclose Wells Fargo slash Dillard's as a creditor. And most importantly, we learned how they funded their extravagant lifestyle, where they spent, as you can see, more than $12,000 a month, but told the court they were living off of Social Security and some gifts from friends and the Social Security payment was less than $1,200 a month. I just don't believe it would be consistent with this court's prior holdings to say that it was okay, it was okay for that attorney to tell them that they did not need to disclose an asset that's so important as their primary bank account, where they live pretty high off the hall, higher than most folks, $12,000 a month, without having to pay any taxes on it. So I believe that I can get you there, Your Honor, based on these inconsistencies and the fact that they can't rely on advice of counsel to defeat a 727A4A false oath claim if that advice is transparently wrong. And then I would like to move on to also talking about failure to amend as a matter of law. Maybe we'll have time to talk about the numerous false statements, as you talk about, and whether or not there's any intent there. But courts have hailed that failing to amend schedules, including this court, constitute a reckless indifference to the truth. These debtors never amended. They never amended to show their interest in the HMG or the HMG account or their numerous other omissions. And this court should and could hold to be consistent with other circuits that a failure to amend can't evidence a reckless indifference to the truth as a matter of law. And I would like to talk again in just a minute, Your Honor. In Mitchell, the court found that numerous, which is an unpublished opinion by this court, so not binding but persuasive, a Mitchell 2002 case. Mitchell is interesting because the bankruptcy court found that, yes, there are these false statements, just like we have here, but they didn't arise to the level of reckless indifference to the truth. The district court reversed and said it was a reckless indifference to the truth because there were so numerous. And this court, in an unpublished opinion, upheld the district court. And in that instance, there were six false statements. And they related to things like they didn't disclose Wedgwood, China. They didn't disclose tools that the debtor used for working on vintage cars. There weren't anything in there. Their failures weren't anything as material as this bank account and the fact that they were spending so much money and giving money to making preference payments to creditors, both commercial creditors and insider creditors. So I believe that as a matter of law, the court can rule that there was a reckless indifference to the truth by failure to amend and also by the numerosity in the statements. And I never thought I'd have time left, but unless you have any questions, Your Honor, I'm not going to berate the issue here. So just to sum up, the bottom line is the HMG account has $12,000? Average per month. I'm sorry, I meant sort of what's as of the petition date. $12,304, Your Honor. That's what's at stake here is essentially what you're saying, is the ability to recover from that, or is it? Well, certainly it's material. The trustee would have had the right to recover that. An individual creditor would not. But if they're not entitled to a discharge, you're able to collect from them for years to come, try to collect? Yes, Your Honor. Go forward. Yes, Your Honor. Fascinating to me how many cases stop at the judgment stage and never get into the collection phase. But it is what it is. Any other questions, Your Honors? I think we've got your argument. Thank you very much. Your Honor, let me address the formulaic application of bankruptcy law that CHP is arguing or suggesting this Court should follow. Bankruptcy is not formulaic. The law is designed to allow the bankruptcy courts and the bankruptcy judges who are presiding over the actual cases, and they're in the trenches every day, flexibility to make decisions, especially when something as important as a discharge, which this Court, well, I'm not sure if it's this Court, but other courts have described as a financial death penalty. That saddling Mr. and Mrs. Schreier with $82 million of debt is, in essence, a death penalty. And as a result, you give every consideration to the debtor, you give every inference from the evidence to the debtor, and it's really a creditor like CHP that has to carry its burden of proof. Each and every complaint that Mr. Ferguson argued before you was argued at trial with evidence to the bankruptcy judge, and he heard those arguments, and he received that evidence, and he had presided over the entire case or the bulk of the case, and some of this was not new to him at trial because it came up in pretrial motions, and he ruled in favor of the debtor on the totality of the evidence, on the totality of the record on it, and each and every one of those complaints is addressed in a very thorough and comprehensive 30-page memorandum of law with findings and conclusions specifically. With respect, and again, Judge Hale found that credibility of the parties was so important. It is hard to explain that they were spending on average $12,000 a month for their living expenses on this account and didn't disclose that. That's kind of, you know, I've participated in cases where it was different. The district court had denied the discharge for failure to disclose $200 or $300 of jewelry that people, you know, you wouldn't even think to list on your schedules. Well, Judge, and again, Judge Hale said they should have, said they were supposed to, and in his opinion he says if they, you know, if they had known that they were supposed to, he believes they would have. He really believes, and he says that these debtors were honest. He believes that they did not have a fraudulent intent. They did not act deceptively, and he says that time and time again. I counted as many as 19 times in his opinion where he found that. I want to move on, however, to the international shoe case regarding the records. That case is 1934, actually supports Judge Hale and the bankruptcy court because in that case if you read it, first of all, the debtor itself was not the party testifying about business records. It was not the party keeping the business records. He had a bookkeeper or he had an accountant, and again, what this court said a long time ago, back in the 1930s, the books covered completely the commercial transactions. Their accuracy is not questioned, but their completeness is, in that there were kept no general ledger accounts so that a statement of financial condition could not be made from the books themselves. However, the bookkeeper testified that he could at any time make a statement or give any desired information with the aid of other records kept, especially the annual inventory, and that is why they said in this case there were actually adequate books and records. Coupled with explanations, again, Mr. CHP before his court is taking matters out of total context and conflating and inflating the importance of many of the matters. Your Honor, thank you very much for listening to us. It was not transparently wrong for Mr. Moore to advise his clients that if this bank account is not in your name, that you do not have to list it in response to this particular question on bankruptcy schedules, but when people ask you where you're getting your money, how you're spending, and so forth, you tell them, and that's what they did immediately at the creditor's meeting and thereafter. Thank you again, Your Honors. We ask that the judgment of the court below be affirmed.